**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

BARRY D. STRANG,

          Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

          Defendant.

No. C04-4037-MWB

**REPORT AND
RECOMMENDATION**

_____

### *TABLE OF CONTENTS*

*I.*    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.*   **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . **2**

     *A.*    *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
     *B.*    *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
          *1.*    *Introductory facts and Strang's hearing testimony* . . . . . . . . **3**
          *2.*    *Lourdes Strang's hearing testimony* . . . . . . . . . . . . . . . . . . . **6**
          *3.*    *Strang's medical history* . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
          *4.*    *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . . . . . **15**
          *5.*    *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

*III.*  **DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
       THE SUBSTANTIAL EVIDENCE STANDARD** . . . . . . . . . . . . . . . . . . **20**

     *A.*    *Disability Determinations and the Burden of Proof* . . . . . . . . . . . **20**
     *B.*    *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . . **23**

*IV.*  **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

*V.*   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

# I. INTRODUCTION

The plaintiff Barry D. Strang ("Strang") appeals a decision by an administrative law judge ("ALJ") denying his application for Title II disability insurance ("DI") benefits. Strang claims the ALJ erred in failing to give controlling weight to the opinions of consultative physicians who actually examined Strang, as opposed to medical professionals who only reviewed Strang's records. He also argues the ALJ erred in discounting his subjective complaints regarding his limitations. (*See* Doc. No. 6)

# II. PROCEDURAL AND FACTUAL BACKGROUND

## A. Procedural Background

On July 20, 2001, Strang filed an application for DI benefits, alleging a disability onset date of October 30, 2000. (R. 32-34)[1] Strang alleged he was disabled due to "cervical facet arthropathy, cervical disc degeneration at multiple levels, cervical myofascial pain syndrome, [and] depression." (R. 170) He stated his condition limited his ability to work due to "low mobility of neck and considerable pain." (*Id.*) His application and request for reconsideration both were denied. (R. 111-120)

Strang requested a hearing (R. 121), and a hearing was held before ALJ Robert Maxwell on December 2, 2002, in Spencer, Iowa. (R. 32-75) Strang was represented at the hearing by attorney David Scott. Strang testified at the hearing, as did his wife of eleven years, Lourdes Strang. Vocational Expert ("VE") Thomas Audet also testified at the hearing.

---

[1]The official transcript also includes documentation relating to Strang's prior claims in 1997 and 2000, that are not at issue in the present case. (*See* R. 14, 34.; *see also* Doc. No. 6, Strang's brief, addressing only the period since October 30, 2000.)

On September 9, 2003, the ALJ ruled Strang was not entitled to benefits. (R.11-26) Strang appealed the ALJ's ruling, and on April 5, 2004, the Appeals Council denied Strang's request for review (R. 6-8), making the ALJ's decision the final decision of the Commissioner.

Strang filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 2) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Strang's claim. Strang filed a brief supporting his claim on September 7, 2004. (Doc. No. 6) The Commissioner filed a responsive brief on October 27, 2004 (Doc. No. 9).

The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Strang's claim for benefits.

### B. Factual Background

#### 1. Introductory facts and Strang's hearing testimony

At the beginning of the hearing, the ALJ explained to Strang that he was last insured for Social Security disability purposes on March 31, 2001, meaning he had to show his disability began prior to that date. (R. 35-36)

At the time of the hearing, Strang was forty-four years old, and living in Milford, Iowa, with his wife. Strang finished the ninth grade in school, but he cannot read very well and he can only print his name, not write in cursive. (R. 37, 43-44) However, he obtained a GED in 1980, which required him to pass a test as to his reading and writing abilities. (R. 54) After he quit school, Strang joined the U.S. Navy, but he only served

four months on active duty because of "Vietnam cutbacks," according to Strang. (R. 37) He received an honorable discharge in 1975, after completing basic training. (R. 54)

After his military service, Strang drove a cement truck for about eight years until he fell and broke out his teeth. He worked as a security guard for a year in California. For five years, he worked for a furniture manufacturer, gluing together pieces of foam. As part of the job, he lifted stacks of foam weighing from seventy-five to 100 pounds. (R. 38, 57) He left the job on February 25, 1995, when he had "a massive heart attack and almost died." (R. 39) He has not worked since that time. (*Id.*) He drew disability payments from the employer for a couple of years, and then his wife went to work to support the family. (R. 40-41)

Strang has chest pains virtually every day, but not constantly. The pain shows up when he feels "stressed out." He never knows when the pain will start or how long it will last, and he keeps nitroglycerin with him. (R. 42-43) He also suffers from shortness of breath, and stated he can only walk about a block before he has to stop and rest. (R. 43) However, he also noted he smokes about a pack a day. (R. 56) Strang had a treadmill test several months prior to the hearing which showed evidence from old heart attacks, but no new problems. Strang did not experience chest pain while he was doing the test, and he had not taken any nitroglycerin for quite some time. (R. 58)

Strang began having neck and back pain when he fell off the cement truck in 1979. He has arthritis that tightens up the muscles in his neck and makes them cramp. He has neck pain even when he is at rest, and the pain makes it difficult for him to concentrate. (R. 44-45) He is able to dress himself and can put on slip-on shoes without help, but muscle cramps prevent him from bending down to tie shoelaces. (R. 45-46) He takes "large amounts of Demerol" for his constant muscle pain. (R. 46) According to Strang, he takes five propoxyphene tablets and five acetaminophen tablets, three times daily.

(*Id.*)[2]  The medication makes his neck pain feel "pretty good," but it also makes him sleepy.  (R. 47)  He takes numerous other medications, but he was unable to recall what they were at the time of the hearing.  (*Id.*)

Strang stated "depression is a very big part of [his] life." (R. 48)  He is depressed because he used to be strong and able to work, and now he "can't even take out the garbage." (*Id.*)  He takes medication and sees a psychiatrist for depression.  (*Id.*; R. 56)

Strang drives a car.  Each day, he drives his wife to and from her job, which is about three-quarters of a mile from their home.  He drove himself to the ALJ hearing, which was ten or twelve miles from his home.  He also drives himself to Sioux Falls, South Dakota, for medical appointments, but he feels very tired after he drives a long distance.  (R. 48-49)

Strang feels his condition has worsened over the last couple of years, but his pain medications have remained the same for about three years.  (R. 50)  According to Strang, a Veterans Administration doctor told him he has myofascial pain syndrome, which Strang understood to be "a sister disease to fibromyalgia." (R. 51-52)  Strang used "neck traction for a year," used a "TENS machine for about a year," and had "trigger point injections off and on for five years." (R. 52)  He had a trigger point injection about two months prior to the hearing.  The injections give him relief for about thirty days, and then the pain returns in his upper back and neck.  (*Id.*)  His condition does not warrant surgery.  (R. 56) Strang also has daily swelling in his feet, sometimes accompanied by tingling.  (R. 53)

---

[2]The ALJ clarified with Strang that he actually takes propoxyphene, which is the chemical used in Darvocet and Darvon compounds, rather than Demerol.  Strang stated he knew the name of the medication started with a "D." (*See* R. 50-51)

Strang has trouble sleeping at night and pain sometimes keeps him awake until the early hours of the morning, causing him to toss and turn. The night before the hearing, he went to bed at 10:00 p.m., tossed and turned and finally got to sleep at about 3:00 a.m., and then slept until 11:30 a.m. the next morning. (R. 53-54)

Strang enjoys hunting, and he stated he did a little duck hunting in the fall of 2002., when he took an eight-day trip to Canada. (R. 57) As far as Strang knows, his doctors have not placed any restrictions on him due to his physical or mental conditions. (R. 58-59)

## 2. *Lourdes Strang's hearing testimony*

Strang's wife, Lourdes Strang ("Lourdes"), has worked for several years at a grocery store in Milford, Iowa. She and Strang had been married for eleven years at the time of the hearing. (R. 59-60)

At the time of Strang's heart attack, Lourdes was pregnant with the couple's second child. She indicated Strang's heart attack added to his stress and affected Strang "really bad." (R. 60) In her opinion, Strang would be unable to return to work because he is unable to lift much or stand for very long. He appears, to her, to be short of breath a lot of the time. (R. 61) Lourdes walks three miles every morning and she has attempted to get Strang to accompany her, but, according to Lourdes, Strang is unable to walk very far. (*Id.*) According to Lourdes, Strang has difficulty going up and down stairs, bending down, and getting up. (R. 64)

Lourdes stated Strang breaks out in hives at times due to stress. When Strang is under a lot of stress, Lourdes indicated he is "[r]eal impossible to live with." (R. 62) She stated it is helpful when she is able to go to Strang's psychiatrist appointments with him, but she is not able to take off work for all of his appointments. (R. 62-63)

Lourdes stated her husband takes painkillers "like a candy." (R. 64) She stated the medication helps him relax somewhat, and sometimes she applies an ointment to his back to help relax his muscles. She indicated Strang does not do yard work or housework. He occasionally tries to clean up or puts in a load of laundry, but nothing more. She opined his pain is worsening, but doctors have told him there is nothing they can do for him from a surgical standpoint. (R. 65-66)

### 3.    *Strang's medical history*

As noted previously, Strang's current application for benefits alleges a disability onset date of October 30, 2000. Therefore, the court will focus on his physical and mental condition beginning immediately prior to that time.

The record indicates that from March 2000, Strang's primary complaints have been neck pain and depression. He also complained intermittently of chest pain and shortness of breath; however, the record also indicates he has continued to smoke despite its effect on his heart and lung condition. The court will discuss Strang's mental problems and his physical problems separately.

### a.    *Depression and mental health problems*

Mark Renner, M.D. noted on March 27, 2000, that Strang's depression was improved on the medication Olanzapine. Strang was no longer hearing voices and was feeling less paranoid. Although the doctor had to repeat some questions during the examination, Strang reacted well and his thought process was coherent and logical. His GAF was assessed at 52, indicating moderate symptoms. (R. 249-50) Strang was not willing to consider additional counseling and stated he was struggling with spiritual issues. His psychotropic medications were continued. (R. 250)

On May 16, 2000, Strang told Dr. Renner that testing had shown his heart was "doing okay." Strang continued to feel the Olanzapine was helping him, and he reported few auditory hallucinations. He stated he was sleeping well and he was looking forward to opening a trading card store. He and his wife had purchased a new van for the business and they planned to make the store a family business. Strang was "really looking forward to this and [was] excited to have some work instead of being inactive all the time." (R. 248) He reportedly had gone fishing recently, and he continued to smoke cigarettes. (*Id.*)

At Strang's next follow-up visit with Dr. Renner on July 25, 2000, he stated he had quit taking the Olanzapine about a month earlier because it was causing weight gain, and he felt he was not doing very well and was "losing it." (R. 247) He reported sleeping well and his appetite was good, but his auditory hallucinations had returned and he and his wife were not getting along well. He stated his trading card business was "going quite well," and he was working there seven days a week. Strang was not willing to resume taking Olanzapine despite its effectiveness, but he agreed to try Moban. (R. 247-48)

Strang underwent a psychological evaluation by Steve B. Mayhew, Ph.D. on August 23, 2000. (R. 241-42) Dr. Mayhew opined Strang would have difficulty with detailed instructions, and his work pace would be quite slow. He found Strang to have a fair ability to perform activities within a schedule and maintain regular attendance. He opined Strang's capacity for sustained attention and concentration over time would be poor. The doctor further opined Strang "would appear to have difficulty completing a normal workday without interruptions from his current symptoms." (R. 242)

Strang was seen for follow-up by Dr. Renner on September 11, 2000, and reported doing "pretty good." He had stopped taking the Moban due to sexual dysfunction. He was looking forward to the hunting season. He reported "sleeping fairly well except

when his back [was] bothering him." (R. 243) He continued to work in the card shop, but stated business had slowed down somewhat. He reported hearing a voice telling him "It's not worth it." (*Id.*) The doctor noted Strang was "coherent and logical," with a "somewhat brighter" affect. He agreed to try Loxitane, another antipsychotic. (*Id.*)

On October 11, 2000, Dee Wright, Ph.D. reviewed Strang's records and completed a Psychiatric Review Technique form (R. 295-308) and a Mental Residual Functional Capacity Assessment form (R. 310-12). Dr. Wright found Strang's subjective reports regarding his limitations to be less than fully credible, based on Strang's noncompliance with treatment recommendations and his "apparent questionable motivation." (R. 313) He found Strang's mental impairment created "some moderate restrictions of function" for Strang, but not of Listing severity. (*Id.*)

Strang saw Dr. Renner for follow-up on November 24, 2000. (R. 355-56) Strang reported good tolerance of the Loxitane, with no sexual dysfunction or weight gain. He denied having auditory or visual hallucinations and reported minimal paranoid ideation. He reported going duck hunting with his uncle in Canada earlier in the fall, and he stated he was "mainly focusing on his business now on the weekends." (R. 355) He was smoking about three packs per day. Overall, Dr. Renner found Strang's depression to be improved, and he assessed Strang's GAF at 65, indicating only mild symptoms. (R. 356)

At his next follow-up visit, on March 2, 2001, Strang saw Dr. Rajesh Singh. Strang reported increased stressors in his life and stated he was feeling worse. He described marital and sexual problems, as well as court proceedings regarding nonpayment of child support. He had suicidal thoughts with no plans or intentions. The doctor prescribed an increased dosage of loxapine (the chemical found in Loxitane). Strang was encouraged to seek marital counseling. (R. 352-53)

Strang saw Dr. Singh for follow-up on April 13, 2001. He stated his mood had not improved on the increased loxapine dosage, so the doctor discontinued the medication and started him on a trial of Effexor XR. Strang reported a continuation of his marital problems, as well as "a lot of pain." (R. 351)

Dr. Singh saw Strang for follow-up on June 1, 2001. Strang stated he had not been doing well, but he also had stopped taking the Effexor due to sexual side effects. The doctor restarted him on loxapine at Strang's request. Strang reported continued significant marital conflict and sexual issues. Strang appeared more receptive to the idea of marital counseling, and stated he would talk with his wife about it. He noted he had a trip to California planned, and stated he would make an appointment with a therapist when he returned. (R. 346)

Strang's next follow-up visit was on August 3, 2001, when he saw Steven Cochran, M.D. (R. 347-48) Strang stated his trip to California had been very pleasant, and he and his wife were getting along much better. He expressed some concern about his wife's health problems, and he was stressed due to his air conditioner failing, but otherwise, he stated he was doing better. He was no longer having any suicidal thoughts. The doctor noted Strang showed "no evidence of thought disorder but he had a difficult time focusing during the session and seemed rather preoccupied and mentioned that he was thinking about his wife's situation during the interview." (R. 348) His medications were continued, with an increase in the frequency of his Xanax, and he was directed to return for follow-up in four months. (*Id.*)

Strang saw Dr. Cochran for follow-up on October 10, 2001. He reported "doing well overall," but he expressed a lot of concern regarding the events of September 11, 2001. (R. 344) His medications were continued, and Wellbutrin was added "to see if he can see improvement in his overall energy level." (R. 345)

Dr. Mayhew performed another psychological evaluation of Strang on October 31, 2001. (R. 316-17) Dr. Mayhew's conclusions basically were unchanged from his prior evaluation of Strang. He summarized his conclusions as follows:

> [Strang] was found capable of understanding and remembering simple instructions and questions during today's exam. He would likely have difficulty following more detailed instructions. His work pace is likely to be quite slow. His ability to perform activities within a schedule is estimated to be fair. Maintaining regular work attendance is estimated to be poor in light of his reported medical history. Pace of work is going to be slow. Sustained attention and concentration is also expected to be poor. There may be some concerns regarding standards of neatness. It is estimated that he would have a difficult time completing a normal workday. If he is determined eligible for disability benefits, it is recommended that these might be managed by a payee.

(R. 317)

On December 10, 2001, Rhonda Lovell, Ph.D. reviewed Strang's records and completed a Psychiatric Review Technique form (R. 329-42) and a Mental Residual Functional Capacity Form (R. 324-28). She found "multiple inconsistencies" in the record regarding Strang's allegations. She noted "a history of mixed compliance with psychiatric treatment"; questions regarding "the possibility of overdramatization of symptoms"; facial expressions and vocalizations of pain that were inconsistent with examining physicians' physical findings; allegations by his wife that he used threats of self-harm to manipulate his marital situation; and little evidence his depressive symptoms had worsened over time. (R. 328) Dr. Lovell found Strang's depressive symptoms were no more severe then when he was maintaining self-employment, and she therefore concluded his "attention and concentration should continue to be adequate for simple

tasks." (*Id.*) She further found he should be able to sustain a regular work schedule "with no more than moderate interference from depressive symptoms." (*Id.*) Dr. Lovell specifically recognized that her assessment differed from that of examining psychologist Dr. Mayhew; however, she further noted Dr. Mayhew "had no access to the conflicting medical record." (*Id.*) On April 26, 2002, Beverly Westra, Ph.D. reviewed Dr. Lovell's findings and concurred in the latter's assessment. (R. 326)

Strang saw Dr. Cochran for follow-up on January 10, 2002. He reported that his energy level was good, and the doctor noted Strang appeared "more alert and talkative" than he had in the past. (R. 343) Strang had enjoyed himself going fishing earlier in the week. He denied suicidal thoughts, but stated he was "discouraged about Christmas because of his financial situations[.]" (*Id.*) Strang expressed no new concerns. He noted he had stopped using Wellbutrin due to sexual side effects. His other medications were continued without change. (*Id.*)

### b.  *Physical complaints*

The record indicates Strang has had neck pain for several years, and he has taken numerous pain medications, undergone physical therapy, trigger point injections, nerve conduction studies, CT scans and X-rays, used a TENS unit, and used home exercise programs. None of these measures has alleviated his pain significantly. None of the objective testing has revealed any significant abnormalities of his spine, yet he has continued to complain of ongoing neck pain and pain medications have been prescribed for him on an ongoing basis. (*See, e.g.*, R. , 264-65, 270-71, 277-79, 286, 287-88) He was diagnosed with degenerative joint disease of the cervical spine and myofascial pain syndrome at some point, and his condition was deemed to be permanent. (*See* R. 237)

In June 2000, his diagnosis was chronic trapezius myalgia, and he was taking Celebrex 100 mg twice daily and Valium 5 mg three times daily as needed for muscle

spasms.  (R. 238)  He saw Jem J. Hof, M.D. and other V.A. doctors for treatment of his back and neck pain on September 11, 2000 (R. 244-46); September 18, 2000 (*see* R. 420, noting Strang's "active problem" was "[s]pondylosis of unspecified site without mention of myelopathy"); November 27, 2000 (R. 354-55); January 9, 2001 (R. 353-54); March 21, 2001 (R. 351-52); April 13, 2001 (R. 350, 387-88); April 16, 2001, (R. 367); June 5, 2001 (R. 348-49); and October 5, 2001 (R. 345-46).  He reported an increase in pain after returning from a hunting trip to Canada in the fall of 2000, but at the same time he stated he had stopped taking some of his medications due to stomach upset.  (R. 354-55)

By June 5, 2001, Strang's diagnoses included cervical facet arthropathy, cervical disc degeneration at multiple levels, and cervical myofascial pain secondary to cervical facet arthropathy.  (R. 348-49)  Dr. Hof noted Strang's "quality of life is extremely poor because of the pain he has to fight with daily."  (R. 349)  The doctor prescribed Vicodin and glucosamine sulfate, and gave Strang trigger point injections.  He also referred Strang for a diagnostic cervical blockade.  (*Id.*)  The court cannot find evidence that a diagnostic cervical blockade was performed; however, it appears this may be because the Veterans Administration did not have the capacity to perform the procedure.  (*See* R. 346)

Dr. Hof saw Strang for follow-up on October 5, 2001.  Strang complained that his pain was a 10 on a scale of 0 to 10, and the Vicodin was not helping the pain.  He noted his soreness had increased since he had gone goose hunting in Canada, where "he had to pace himself so he could at least shoot," and he had been unable to help set the decoys. (R. 345)  Strang stated hunting was "one of the few things that he [had] left to enjoy but if he does it too long . . . he pays too much of a price doing the activity."  (*Id.*)  Dr. Hof opined Strang might have "advancing cervical stenosis."  (R. 346)  He noted Strang's MRI showed a disc bulge at C5-6 and C6-7 without spinal stenosis, but the doctor

suspected "enhancing cervical facet arthropathy with exam suggestive of some possible foraminal encroachment." (*Id.*) He planned to schedule Strang for an EMG and then another MRI. He increased Strang's dosage of Gabapentin, discontinued the Vicodin, and placed him on Darvon. The doctor again noted Strang "appear[ed] to be a candidate for diagnostic cervical blockade to identify if his pain refers to facets only." (*Id.*) He noted the VA still did not have the capacity to do diagnostic blockaids. (*Id.*)

On October 19, 2001, Strang underwent an X-ray of his lumbar and cervical spine. The only remarkable impression was "[m]ild narrowing of the L5-S1 intervertebral disc, suggestive of mild degenerative disc changes at this level." (R. 322) Otherwise, the X-rays were unremarkable. (*Id.*)

Kenneth Hunziker, M.D. saw Strang on October 19, 2001, for a disability determination exam. He found Strang to have "some degenerative arthritis of the neck." (R. 319) His range of motion examination revealed some reduced mobility in Strang's cervical and lumbar spine (R. 321), but his gait was noted to be normal and there is no indicating that he was unable to perform any of the range-of-motion maneuvers. (*See* R. 320-21)

On November 19, 2001, Dennis A. Weis, M.D. reviewed Strang's records and completed a Physical Residual Functional Capacity Assessment form. (R. 323, 434-41) He found Strang should be able to lift fifty pounds occasionally and twenty-five pounds frequently; stand/walk and sit for six hours in a normal workday, and push/pull without limitation. He opined Strang would have frequent postural limitations in all areas, but would have no manipulative, visual, communicative, or environmental limitations. (R. 434-41) Dr. Weiss supported his conclusions by noting inconsistencies in the record that eroded Strang's complaints. Dr. Weiss found "a significant gap in [Strang's] seeking or receiving ongoing medical attention for his neck complaints between 1999 and 2001.

In addition to this, current x-rays are largely unremarkable. Motor and neurologic exams are normal." (R. 323) On April 1, 2002, Lawrence F. Staples, M.D. reviewed Dr. Weis's findings and concurred in the latter's assessment of Strang. (R. 441)

**4.      *Vocational expert's testimony***

VE Tom Audet stated Strang's past relevant work at the furniture factory is classified as unskilled, heavy work. Strang also worked at one time as a kitchen supervisor, but the VE stated Strang would not have acquired any skills in that job that are transferable to another skilled, but less physical, occupation. (R. 68-69)

The ALJ asked the VE the following hypothetical question:

> Assume with me you're dealing with an individual of younger age, high school equivalency education, work history as you summarized. Assume the person has a medically determinable impairment or impairments that cause, first of all, the very same work-related limitations described in the testimony presented here today, finding that testimony fully factual and credible. Would you expect a person to be able to do either of [Strang's] past physical occupations?

(R. 69-70) The VE responded, "No." (R. 70) He explained that per Strang's testimony, he gets exhausted and short of breath just from being up, and Strang's wife indicated he is unable to stand or sit for very long at a time and he is short of breath. If their combined testimony is considered credible, then the VE opined Strang would not be capable of being productive on a full-time basis. (*Id.*)

The ALJ then asked the VE to consider a person with the same work-related limitations as in the first hypothetical, and to answer the following question:

> [T]his time I'm asking you about the affect [sic] of the
> Disability Determination assessment. There would be first of
> all a physical and then secondly a mental health aspect to the
> question. Taking the physical, . . . what if the person could
> occasionally lift and carry 50 pounds, frequently 25 pounds,
> stand, walk, or sit with normal breaks about six hours of
> eight, push/pull is unlimited, postural activities . . . all could
> be done frequently. . . . This is medium work, is it not?

(R. 70) The VE agreed the ALJ had described medium work, including light and sedentary work. (*Id.*) The ALJ continued:

> Let's plug in some additional limitations. The ability to make
> personal, social, and occupational adjustments as found by the
> Disability Determination Service here . . . [and a mental RFC
> based on] a sliding scale of 20 different areas of mental
> function as it relates to work, from not significantly limited to
> markedly limited. Assume no areas of marked limitation.
> Moderate limitation in categories 3 and 5, dealing with under-
> standing, remembering, and carrying out detailed instructions
> and in maintaining attention and concentration over extended
> periods of time. Moderate limitation in category 11, dealing
> with completing a normal workday and workweek. Category
> 17, responding appropriately to changes in the work setting.
> All other areas not significantly limited. Would you expect a
> person to be able to do any unskilled medium jobs?

(R. 71) The VE responded that the hypothetical individual should be able to perform unskilled, medium jobs such as dishwasher/kitchen helper, simple industrial cleaning jobs, and some laundry worker positions. (R. 71-72)

The VE opined the individual would not be able to work in Strang's former job of kitchen supervisor "primarily because of the mental limitations, the detailed work, and things like that, maintaining concentration." (R. 72) His former job of gluing foam for furniture cushions would be ruled out due to the physical requirements of the job. (*Id.*)

The VE concluded the hypothetical individual would have no significant limitations on performing the full range of unskilled medium, light, and sedentary jobs, based on the limitations listed in the DDS assessments of Strang. (*Id.*)

The ALJ then asked the VE a third hypothetical question, as follows:

> Now, the third question I want to ask you about, there was a medical source statement that Counsel made reference to that is in the file. And it's by the consulting – consulting physician, Dr. Mayhew. What if – and this has to do with the ability to make personal, social, and occupational adjustments. An individual is capable of understanding and remembering simple instructions, would likely have difficulty following more detailed instructions. Pace would likely be quite slow. Ability to perform activities within a schedule is estimated at fair. Maintaining regular work attendance estimated to be poor. Pace of the work is going to be slowed. Sustained attention and concentration, expect it to be poor. Estimated would have a difficult time completing a normal workday. And if granted benefits, would need a representative payee. How would this – a person showing this sort of performance from a mental standpoint be viewed in terms of the kinds of unskilled jobs that we have in the record?

(R. 73) The VE responded the hypothetical individual would be unable to do "even simple routine unskilled work," due to the slow work pace, poor concentration levels, and poor attendance. (*Id.*)

## 5.  *The ALJ's decision*

The ALJ found Strang was not disabled, and therefore found no reason to reopen his prior unfavorable determinations. (R. 15) The ALJ acknowledged that if Strang's subjective complaints were taken as true, then "a finding of 'disabled' from his alleged

onset date of October 20, 2000, would necessarily follow." (R. 16) However, the ALJ found Strang's testimony regarding the duration and level of his pain and subjective complaints regarding his limitations was not supported by the evidence. (*Id.*)

As support for his determination that Strang's subjective complaints were not credible, the ALJ noted the following:

(1) The record contains minimal evidence to support Strang's allegation of chronic back and neck pain, and no evidence of any present significant heart disease. (*See* R. 17)

(2) Strang told his doctor, in August 2002, that he was not experiencing any chest pain, palpitations, shortness of breath, paroxysmal nocturnal dyspnea, orthopnea, headaches, dizzy spells, abdominal pain, nausea, vomiting, bladder problems, bladder difficulties, or numbness or tingling in his hands. Although Strang complained of continued neck pain, he indicated the pain did not radiate, and an MRI failed to reveal any compression on Strang's nerves or spinal cord. The doctor found Strang's condition to be stable. Strang indicated he was not taking any nitroglycerin, and he was experiencing benefits from Viagra. (*Id.*)

(3) The record contains "significant gaps in treatment," with minimal objective clinical findings. (*See* R. 18)

(4) Regarding Strang's mental problems, although the ALJ found he has a medically-determinable affective disorder, the ALJ concluded the record "fails to establish that [he] has borderline intellectual functioning or any other medically determinable cognitive impairment which can reasonably be expected to place more than slight or minimal limitations on [his] ability to perform basic work-related activities." (R. 19; *see* R. 18-19)

The ALJ specifically discounted the opinion of consulting psychologist Steven B. Mayhew, Ph.D., who concluded Strang had a poor ability to sustain attention and

concentration, and would have difficulty completing a normal work day without interruptions from his current symptoms. The ALJ found Dr. Mayhew's opinion to be based primarily on Strang's subjective complaints, which the ALJ found were not supported by other evidence in the record and were contradicted by "significant inconsistencies and incongruities found in the record." (R. 22-23) The ALJ found the opinions of the other agency consultants to be supported by the record as a whole, and adopted their opinions that indicated Strang retained both the physical and the mental functional capacity to perform unskilled, medium-exertion-level work. (R. 23-24)

The ALJ found Strang to have the following medically-determinable impairments, the combination of which he considered to be "severe": "coronary artery disease (status post four-vessel bypass graft on April 11, 1995); chronic back pain stem[m]ing from 'mild' degenerative changes at L5-S1; chronic neck pain (stemming from 'mild' degenerative spondylosis, 'mild' annual disc bulges at C5-6, C6-7 and T2-3, cervical facet arthropathy, and chronic cervical myofascial pain syndrome); chronic obstructive pulmonary disease (COPD), gast[r]oesophageal reflux disease (GERD), and a major depressive disorder[.]" (R. 25 ¶ 3) The ALJ found Strang's impairments, considered alone or in combination, did not meet the requirements of the Listings. (R. 19-20, 25 ¶ 4)

The ALJ found Strang retained the residual functional capacity to perform the full range of unskilled, medium-exertional work activity. (R. 25 ¶ 7; *see* R. 20-21, 23-24) Although Strang would be unable to perform semi-skilled or skilled work due to his affective disorder, the ALJ found he "retains the mental residual functional capacity to perform simple, repetitive tasks on a sustained basis, consistent with unskilled work activity." (R. 24) The ALJ concluded Strang retained the capacity for work that exists in significant numbers in the national economy, and therefore, he was not disabled at any time through the date of the ALJ's decision. (R. 25)

## III.  DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A.  Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)).  First, the Commissioner will consider a claimant's work activity.  If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.  20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003).  The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's

"complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court must affirm the ALJ's factual findings if they are supported by substantial evidence on the record as a whole. *Id.* (citing *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998) (citing *Matthews v. Bowen*, 879 F.2d 422, 423-24 (8th Cir. 1989)); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier, id.*; *Weiler v. Apfel*, 179 F.3d 1107, 1109 (8th Cir. 1999) (citing *Pierce v. Apfel*, 173 F.3d 704, 706 (8th Cir. 1999)); *accord Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)); *Hutton v. Apfel*, 175 F.3d 651, 654 (8th Cir. 1999); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022 (citing *Craig*, 212 F.3d at 436); *Willcuts v. Apfel*, 143 F.3d 1134, 1136 (8th Cir.

1998) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S. Ct. 456, 464, 95 L. Ed. 456 (1951)); *Gowell*, 242 F.3d at 796*; Hutton*, 175 F.3d at 654 (citing *Woolf*, 3 F.3d at 1213); *Kelley*, 133 F.3d at 587 (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo.*" *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d

1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217;
*Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied,* 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987).   Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)).   As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)    the claimant's daily activities;
> 2)    the duration, frequency and intensity of the pain;
> 3)    precipitating and aggravating factors;
> 4)    dosage, effectiveness and side effects of medication;
> 5)    functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002).

### IV. ANALYSIS

Strang argues the ALJ erred in the weight he assigned to the opinions of the various medical experts, and in discounting Strang's subjective complaints. The ALJ gave controlling weight to the opinions of Dee Wright, Ph.D. and Rhonda Lovell, Ph.D., state agency consultants who performed paper reviews of Strang's record. Both opined Strang's mental condition would not prevent him from working at simple jobs. The ALJ discounted the opinions of Dr. Mayhew, who examined Strang on two occasions and opined Strang would have difficulty maintaining an appropriate work pace, regular attendance, sustained attention and concentration, and following difficult instructions. Dr. Mayhew opined Strang would have difficulty completing a normal workday, and he likely would be unable to manage his own benefits, should they be awarded. However, the ALJ found Dr. Mayhew's opinions to be contrary to the other objective evidence of record, and Dr. Lovell noted Dr. Mayhew had not had the benefit of all of Strang's records in reaching his conclusions.

The court finds evidence in this record to support both Strang's position and the ALJ's opinion. Strang's mental condition, in particular, is difficult to evaluate. The court finds it significant that Strang repeatedly stopped taking medications or altered his medication regimen without consulting his treating doctors, because he did not like certain side effects from the medications. In addition, although Strang limits his activities, he nevertheless feels well enough to take extended hunting trips.

The court finds this case to be precisely the type of situation considered by the Eighth Circuit Court of Appeals in *Baldwin v. Barnhart*, 349 F.3d 549 (8th Cir. 2003),

*Roe v. Chater*, 92 F.3d 672 (8th Cir. 1996), and *Culbertson v. Shalala*, 30 F.3d 934 (8th Cir. 1994). The court's review of the Commissioner's decision is deferential, and the court may not reverse the Commissioner's decision simply because evidence exists in the record to support an opposite conclusion. In this case, the record supports "two inconsistent positions . . . and one of those positions represents the agency's findings." The court, therefore, must affirm the Commissioner's decision. *See Baldwin, Roe,* and *Culbertson, supra.*

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[3] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1)(C) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be affirmed.

**IT IS SO ORDERED.**

**DATED** this 23rd day of June, 2005.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[3]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).